IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
Civil Action No. 3:26-CV-00112

PIERCE J. PLIAPOL,

        Plaintiff,

v.

131 MAIN - SOUTH PARK LLLP AND
CAPTIVA RESTAURANT GROUP,
LLC,

        Defendants.

**COMPLAINT**
(JURY DEMAND)

COMES NOW the Plaintiff, Pierce J. Pliapol ("Plaintiff") and files this Complaint against Defendants, 131 Main -South Park LLLP ("131 Main") and Captiva Restaurant Group, LLC ("Captiva") (jointly referred to as "Defendants") asserting claims and seeking damages pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq*. ("Title VII").

## NATURE OF THE CLAIMS

Plaintiff brings this action against Defendants for discrimination, hostile work environment, and retaliation based on Plaintiff's sexual orientation (gay man) in violation of Title VII.

## JURISDICTION AND VENUE

1. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 and 42 U.S.C. § 2000e-5(f)(3).

2. Plaintiff has exhausted his administrative remedies by timely filing a Charge of Discrimination based on sex with the Equal Employment Opportunity Commission, Charge No. 430-2024-02534 ("EEOC Charge") and by filing this Complaint within 90 days of receiving a

1

Notice of Right to Sue with respect to the EEOC Charge.

3. Venue is proper in this district under 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. § 1391(b), because the unlawful employment practices complained of herein occurred at Defendants' restaurant within this district located at 5970 Fairview Road, Charlotte, North Carolina 28210, and Defendants maintains their principal offices at 9606 Bailey Road, Suite 247, Cornelius, North Carolina 28031, also within this district.

## PARTIES

4. Plaintiff is a citizen and resident of Mecklenburg County, North Carolina.

5. At all relevant times, Plaintiff was an employee of Defendants as defined by 42 U.S.C. § 2000e(f).

6. Plaintiff is a gay man and a member of a protected class under Title VII.

7. 131 Main is a North Carolina limited liability limited partnership organized under the laws of North Carolina. 131 Main's registered agent is Joseph S. Douglas, and its principal office is located at 9606 Bailey Road, Suite 247, Cornelius, North Carolina 28031.

8. Captiva is a North Carolina limited liability company organized under the laws of North Carolina. Captiva's registered agent is Joseph S. Douglas, and its principal office is located at 9606 Bailey Road, Suite 247, Cornelius, North Carolina 28031.

9. Upon information and belief, Defendants jointly operate the restaurant known as 131 Main – South Park, located at 5970 Fairview Road, Charlotte, North Carolina 28210 (the "Restaurant").

10. Upon information and belief, Defendants share the same registered agent (Joseph S. Douglas), the same principal office address, the same telephone number, owners, management personnel, and controlling principals.

11. Upon information and belief, the same management personnel of Defendants

exercised authority over employment decisions affecting Plaintiff without regard to which entity nominally employed him.

12. Upon information and belief, Defendants constitute a single, integrated employer.

13. At all relevant times, Defendants employed fifteen (15) or more employees for each working day in each of twenty (20) or more calendar weeks in the current or preceding calendar year, and are therefore "employers" within the meaning of 42 U.S.C. § 2000e(b).

## FACTUAL ALLEGATIONS

14. In approximately May 2020, Defendants hired Plaintiff as a server at their Restaurant. Over the course of his employment, Plaintiff also performed bartending and occasional managerial duties as needed or requested by Defendants.

15. Plaintiff was a long-term, high-performing employee at the Restaurant. Plaintiff consistently received positive guest reviews and maintained strong relationships with regular customers, many of whom specifically requested his service.

16. Throughout his employment, Plaintiff met or exceeded Defendants' performance expectations.

17. Throughout his employment, Plaintiff maintained an excellent attendance record and had never been warned that his job was in jeopardy for attendance issues.

18. Plaintiff took pride in his work at the Restaurant. Plaintiff worked hard to provide the highest level of service for the Restaurant's customers consistent with a fine dining experience.

19. In approximately July/August 2022, Defendants hired Krista Tagre ("Tagre") as Service Manager at the Restaurant. Tagre had authority over scheduling, discipline, and working conditions at the Restaurant. Tagre exercised direct supervisory and managerial authority over Plaintiff.

20. Within approximately one month after her arrival, Tagre began subjecting Plaintiff

to a persistent pattern of harassment based on his sexual orientation. Tagre's harassment and discrimination of Plaintiff because of his sexual orientation was frequent, recurring, and took multiple forms.

21. In early October 2022, shortly after Plaintiff signed a modeling contract, Tagre reacted with mockery and hostility. Tagre sarcastically referred to Plaintiff as a "big model," gesturing with her hands in a stereotypical "gay" manner.

22. Also in October 2022, Tagre further demonstrated her hostility against gay people when she learned Plaintiff rescued a puppy, stating: "It's a shame your dog has a father like you," with the clear implication being that it was unfortunate for the dog to have a gay father/owner.

23. Tagre also demonstrated her animus toward Plaintiff in nonverbal ways. After greeting other employees warmly, Tagre would then look Plaintiff up and down and roll her eyes.

24. On or about June 13, 2023, during a conversation in the front of the Restaurant, Tagre told Plaintiff: "You have no morals as a gay man." Tagre further conveyed that Plaintiff's sexual orientation rendered him immoral and could not be reconciled with Plaintiff's Christian faith. Tagre repeated the phrase "no morals" to Plaintiff on at least three additional occasions, including by stating it while walking past Plaintiff in the workplace.

25. Also in June 2023, during Pride Month, Tagre openly expressed hostility toward the LGBTQ+ community. In front of Plaintiff and a lesbian coworker, Tagre expressed disdain for LGBTQ+ people and the Pride parade, using derogatory language and referring to "those types of people."

26. Tagre also used Plaintiff's sexual orientation to mock his appearance, both with respect to his physical traits and how he dressed.

27. In early 2023, Tagre's intolerance of Plaintiff because he was a gay man led her to

harass him for his Asian heritage, making fun of his eyes and face and asking how he could be Asian when "his eyes weren't slanted."

28.     On more than one occasion, in 2023 and 2024, Tagre stated to Plaintiff: "You're gay, you should know how to dress, why do you look like shit today?" Similar comments referencing Plaintiff's sexual orientation occurred frequently, both in front of coworkers and privately to Plaintiff.

29.     In the summer of 2023, Tagre bragged to Plaintiff about winning an intense argument she was involved in with women she identified as "lesbians." Tagre spoke of these "lesbians" in a disparaging manner and seemed disappointed that the encounter did not become physical.

30.     During another conversation between Plaintiff and Tagre later the same night, Tagre described a conversion she had with Paige Douglas, Defendants' Director of Resources, stating: "Paige said I [Tagre] need to be a bitch to get people like you to listen to me." The phrase "people like you" was clearly a reference to Plaintiff's sexual orientation.

31.     In or about November 2023, Tagre told Plaintiff he needed to go home to Florida so his family could "straighten [him] out," making it clear that she was referring to Plaintiff's identity as a gay man and her belief that Plaintiff's sexual orientation is something wrong that needed to be fixed.

32.     In late 2023 through early 2024, Tagre discriminated against and harassed Plaintiff by manipulating his work schedule, which included removing him from more lucrative shifts serving as shift "zoner" or head waiter. Tagre's schedule manipulation was not based on any performance issues, but can only be explained by Tagre's animus toward Plaintiff as a gay man and her desire to exert financial pressure on him and force his resignation.

5

33. Tagre regularly monitored Plaintiff more closely than other employees, watching him "like a hawk," and calling him out for minor infractions such as being a few minutes late while expressing no concern or criticism of other employes for more severe conduct.

34. Tagre also unjustifiably singled out Plaintiff and accused him of "breaking the rules," such as by giving away or accepting tables, when doing so was a common practice and tolerated when done by other employees.

35. Tagre routinely belittled and demeaned Plaintiff in the presence of coworkers, using profanity directed at him, including statements such as: "I'm busy. Go fucking find someone else. I don't have time for your Bull Shit." Tagre's hostile reactions were not provoked by any actions or statements of Plaintiff, but were because Plaintiff's sexual orientation was not acceptable to her.

36. Tagre's harassment occurred regularly in the workplace and in the presence of other employees. The conduct was both objectively offensive to a reasonable person and subjectively experienced by Plaintiff as humiliating, degrading, and emotionally harmful.

37. Tagre's conduct was severe and pervasive. It altered the terms and conditions of Plaintiff's employment by creating a work environment permeated with discriminatory intimidation, ridicule, and insult sufficiently severe and pervasive to affect a reasonable person's ability to perform his job.

38. Following the dog incident described above, Plaintiff was so distraught he wanted to resign. In tears, Plaintiff described his mistreatment by Tagre to Assistant Manager Hailey Rivera. Rivera convinced Plaintiff not to resign, and she attempted to help address the situation.

39. Between approximately October 22 and October 31, 2022, Plaintiff and Rivera had multiple conversations regarding Tagre's mistreatment of Plaintiff, and Rivera stated she would discuss the mistreatment with Owner Joseph S. Douglas and General Manager Steve Szymonski.

40. Upon information and belief, Rivera did report Plaintiff's complaints about Tagre to Douglas and Szymonski in November of 2022. Thereafter, Tagre backed off from her harassment of Plaintiff for about one week before it resumed, but nobody from upper management discussed the situation with Plaintiff or made Plaintiff aware of any investigation or actions to be taken.

41. Over the course of the following approximately eighteen (18) months, Plaintiff made additional complaints to management regarding the ongoing harassment by Tagre. These complaints were directed to members of Defendants' management team, including General Manager Steve Szymonski, Owner/Founder Joseph S. Douglas, Director of Service Paige Douglas, Ambassador Manager Christine Conley, and Bar Manager Steven Teckmeyer.

42. Plaintiff complained directly to Steve Szymonski on multiple occasions, beginning in approximately December 2022 and continuing through April 2024. Szymonski routinely responded: "It seems like you need a sit down," and would make jokes, telling Plaintiff and Tagre they needed to "hug and make up." Despite Szymonski's acknowledged awareness of Tagre's treatment toward Plaintiff, he made no efforts to diffuse the tensions or take corrective action.

43. Plaintiff also complained directly to Steven Teckmeyer, the Bar Manager, who was aware of the situation and had personally heard discriminatory comments made by Tagre. Teckmeyer indicated he did not believe there was anything they could do, because all complaints about Tagre went unnoticed or were ignored by upper management.

44. Additionally, upon information and belief, Ambassador Manager Christine Conley made reports to Owner/Founder Joseph S. Douglas and Director of Service Paige Douglas on at least three separate occasions about Tagre's harassment of Plaintiff. Plaintiff is informed and believes that Conley's reports were made between July 2023 and February 2024.

45. On or about April 13, 2024, Plaintiff made a final complaint to Defendants' senior leadership about the pervasive harassment to which he was being subjected. Once again, Defendants failed to take any corrective or remedial action and the harassment continued.

46. At all relevant times, Defendants' management had actual knowledge of Tagre's discriminatory conduct through Plaintiff's direct complaints and, upon information and belief, through the observations and reports of other employees who witnessed the harassment and through other internal communications. Despite this knowledge, Defendants failed to act to stop the unlawful harassment.

47. Defendants' animus toward Plaintiff was also demonstrated by Defendants' lack of concern about and mishandling of a workplace injury sustained by Plaintiff on or about September 15, 2023, for which Plaintiff received stitches and medical treatment at the hospital. Upon his return to work, Plaintiff filled out workers' compensation paperwork and an incident report with General Manager Steve Szymonski. Plaintiff was informed that his medical expenses would be covered by workers' compensation insurance. Tagre also assured Plaintiff that the medical bills would be handled and dismissed his concerns.

48. Upon information and belief, Defendants never properly processed Plaintiff's medical claim, which resulted in an unpaid medical bill in Plaintiff's name that was ultimately sent to collections by Atrium Health.

49. Upon information and belief, at least one other employee has experienced a similar workplace injury but did not have her medical bills mishandled in the same manner.

50. Upon information and belief, Defendants' failure to properly handle Plaintiff's workers' compensation claim was not inadvertent but was part of the broader pattern of discrimination, harassment, and retaliation against Plaintiff based on his sexual orientation.

8

51. Beginning in late 2023 and continuing beyond his constructive discharge by Defendants, Plaintiff experienced a dramatic health decline as a direct result of the hostile work environment. Plaintiff suffered dramatic weight loss, loss of sleep, and heightened anxiety before shifts. Tagre mocked Plaintiff's visible weight loss, which was caused by the very stress her conduct inflicted on Plaintiff.

52. Plaintiff engaged in protected activity under Title VII by opposing Tagre's discriminatory conduct and complaining to Defendants' management on multiple occasions, including on or about October 24, 2022, in approximately December 2022, on numerous additional occasions through 2023 and into 2024, and on or about April 13, 2024.

53. Defendants were aware of Plaintiff's protected activity. Following Plaintiff's complaints, Defendants subjected Plaintiff to retaliatory conduct, including but not limited to:

   a. Increased scrutiny and heightened disciplinary treatment of Plaintiff relative to similarly situated employees who had not complained of discrimination;

   b. Dismissal and disregard of Plaintiff's complaints about harassment, without investigation or corrective action;

   c. Continued and unabated exposure to Tagre's hostile supervision despite management's knowledge of the harassment;

   d. Mishandling of Plaintiff's workers' compensation claim, leaving Plaintiff with personal financial liability for a workplace injury;

   e. Manipulating Plaintiff's work schedule to reduce his income as a form of economic coercion and punishment;

   f. Threatening Plaintiff with termination if he did not report to work with an open wound despite being injured (with an open wound on his hand) or find someone to

9

Case 3:26-cv-00112-SCR-DCK   Document 1   Filed 02/12/26   Page 9 of 16

cover his shift, while knowing of medical and health safety reasons that rendered Plaintiff unable to work; and

g. Retaliating against Plaintiff after his initial October 2022 complaint by escalating rather than remedying the hostile conditions, including Tagre's resumption of harassment in November 2022 approximately one week after Haley Rivera's report to management.

54. By April 2024, the cumulative effect of Defendants' conduct had rendered Plaintiff's working conditions intolerable. The conditions that forced Plaintiff's resignation include, but are not limited to:

a. Nearly two years of persistent, unaddressed harassment by his direct supervisor targeting his sexual orientation, including derogatory comments, religiously tinged moral condemnation, and public humiliation;

b. Defendants' repeated failure to take any corrective action despite multiple complaints to upper management;

c. Heightened and disparate scrutiny and discipline directed at Plaintiff compared to similarly situated employees who were not gay;

d. Mishandling of Plaintiff's workers' compensation claim and dismissive responses to his concerns about resulting financial liability;

e. Schedule manipulation reducing Plaintiff's income as a form of economic retaliation;

f. Being threatened with termination for failing to report to work with an open wound or failing to find his own shift coverage while recovering from an injury; and

g. Management's implicit endorsement of Tagre's conduct by failing to discipline her

or otherwise intervene.

55. On or about April 19, 2024, Plaintiff suffered an off-the-job injury which included an open wound to his forearm.

56. Employees are not permitted to work at the Restaurant with an open wound.

57. Plaintiff provided advance notice to Defendants that he would not be able to report for his shift scheduled for April 22, 2024, and that he would attempt to get another employee to cover his shift. Plaintiff was unable to get another employee to cover his shift on April 22, 2024.

58. Knowing Plaintiff had an open wound and could not find coverage for his shift on April 22, 2024, Defendants informed Plaintiff that if he did not report for his shift, he would be discharged from employment, even with medical documentation to substantiate his injury and his need to miss work that day.

59. On or about April 22, 2024, Plaintiff was absent from work due to his injury and his inability to find someone to cover his shift. Rather than be discharged, he resigned from his employment with Defendants.

60. The conditions and circumstances under which Plaintiff resigned were so intolerable that a reasonable person in Plaintiff's position would have felt compelled to resign.

61. Plaintiff was constructively discharged from his employment with Defendants on April 22, 2024.

**FIRST CAUSE OF ACTION**
**(Hostile Work Environment in Violation of Title VII)**

62. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

63. Plaintiff is a gay man and a member of a protected class under Title VII.

64. Beginning no later than approximately July 2022 and continuing through April 22,

11

2024, Plaintiff was subjected to unwelcome harassment based on his sexual orientation. The harassment included, but was not limited to: direct statements morally condemning Plaintiff's sexual orientation and that being a gay man is not compatible with his Christian faith; derogatory comments linking stereotypes about gay men to Plaintiff's appearance; boasting about physical violence against members of the LGBTQ community; profanity directed at Plaintiff; use of the phrase "people like you" in reference to Plaintiff's sexual orientation; coded references to "straightening out" Plaintiff's identity; failing to provide the same rights, benefits, care, and concern as other employees injured on the job; schedule manipulation as economic coercion; and disproportionate scrutiny and discipline.

65. The harassment was sufficiently severe or pervasive to alter the terms and conditions of Plaintiff's employment and to create an abusive working environment. The harassment occurred daily or near daily, was directed at Plaintiff by his direct supervisor, was threatening, unreasonably interfered with Plaintiff's work performance, and caused substantial distress, anxiety, sleeplessness, and weight loss.

66. At all relevant times, Tagre served as Service Manager at 131 Main and was Plaintiff's direct supervisor.

67. At all relevant times, Tagre was authorized and empowered by Defendants to take tangible employment actions against Plaintiff, including issuing corrective actions and written warnings, directing Plaintiff's daily work activities and assignments, imposing discipline, monitoring, and evaluating Plaintiff's performance, controlling Plaintiff's schedule and shift assignments, and recommending termination. Tagre exercised this authority during the relevant period, including by issuing write-ups to Plaintiff and, in coordination with other managers, removing Plaintiff from his headwaiter shift and zoner shifts.

68. Tagre qualifies as Plaintiff's "supervisor" because she was empowered to take tangible employment actions against Plaintiff and did so with the knowledge and consent of her superiors.

69. Defendants are directly and vicariously liable for the hostile work environment created by their supervisory employee Tagre.

70. Defendants' General Manager, Owner/Founder, Director of Service, Bar Manager, Assistant Manager, and others received complaints and/or were made aware of complaints about Tagre's treatment of Plaintiff.

71. Despite knowing about the unlawful treatment of Plaintiff, Defendants failed to take any corrective or remedial action to stop the harassment. The harassment continued unabated until Plaintiff's constructive discharge on April 22, 2024.

72. Plaintiff did not unreasonably fail to take advantage of corrective opportunities. To the contrary, Plaintiff reported Tagre's discriminatory conduct to management on multiple occasions over the course of nearly two years, and his complaints were consistently ignored or dismissed.

73. The foregoing conduct was both objectively offensive to a reasonable person and subjectively experienced by Plaintiff as humiliating, degrading, and emotionally harmful.

74. A reasonable person in Plaintiff's position subjected to nearly two years of persistent anti-gay remarks, moral condemnation of his sexual orientation, boasting about physical violence against LGBTQ persons, and other behavior described above would find that the terms and conditions of Plaintiff's employment had been materially altered.

75. Plaintiff subjectively experienced severe emotional distress, anxiety, depression, chronic sleeplessness, and involuntary weight loss because of the hostile work environment.

76. As a direct and proximate result of the hostile work environment created and maintained by Defendants, Plaintiff has suffered damages, including, but not limited to: lost wages, lost employment benefits, pain and suffering, inconvenience, mental anguish, emotional distress, humiliation, loss of enjoyment of life, and loss of status and reputation, which damages Plaintiff seeks to recover from Defendants.

77. The wrongful conduct alleged herein was engaged in by the Defendants willfully, with malice, and/or with reckless indifference with respect to the federally protected rights of Plaintiff, entitling Plaintiff to an award of punitive damages.

78. Plaintiff seeks remedies of back pay, front pay (as applicable), compensatory damages, punitive damages, attorney's fees, and all other relief allowed by applicable law.

**SECOND CAUSE OF ACTION**
**(Sex Discrimination in Violation of Title VII)**

79. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

80. Defendants terminated Plaintiff's employment because of his sex (sexual orientation) in violation of Title VII.

81. Plaintiff is a gay man who was performing his duties as a server in a satisfactory manner. Plaintiff qualified for the job he had with Defendants and was meeting his employers' legitimate expectations.

82. As a result of Defendants' actions, Plaintiff has suffered lost wages, lost employment benefits, pain and suffering, inconvenience, mental anguish, emotional distress, humiliation, loss of enjoyment of life, and the loss of status and reputation.

83. Plaintiff seeks remedies of back pay, front pay (as applicable), compensatory damages, punitive damages, attorney's fees, and all other relief allowed by applicable law.

## THIRD CAUSE OF ACTION
**(Retaliation in Violation of Title VII)**

84. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

85. Plaintiff engaged in protected activity under Title VII by opposing discriminatory practices and complaining to Defendants' management about Tagre's harassment on a number of occasions as described herein.

86. Defendants were aware of Plaintiff's protected activity.

87. Following Plaintiff's protected activity, Defendants subjected Plaintiff to materially adverse actions that would dissuade a reasonable employee from engaging in protected activity, including: continued and unabated harassment by Tagre; increased scrutiny and discipline; dismissal of Plaintiff's complaints without investigation; mishandling of Plaintiff's workers' compensation claim resulting in financial harm; schedule manipulation reducing Plaintiff's income; threats of termination when Plaintiff was recovering from an injury; and ultimately, creating working conditions so intolerable as to result in Plaintiff's constructive discharge.

88. Defendants' retaliatory conduct in violation of Title VII has caused Plaintiff to suffer damages, including lost wages, lost employment benefits, pain and suffering, inconvenience, mental anguish, emotional distress, humiliation, loss of enjoyment of life, and loss of status and reputation, which damages Plaintiff seeks to recover from Defendants.

89. Plaintiff seeks remedies of back pay, front pay (as applicable), compensatory damages, punitive damages, attorney's fees, and all other relief allowed by applicable law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that the Court:

1. Enter judgment in favor of Plaintiff on each of his claims;

2. Award Plaintiff damages in amounts to be proven at trial for back pay, front pay (as applicable), compensatory damages, punitive damage, and prejudgment interest thereon;

3. Grant Plaintiff his costs and an award of his reasonable attorneys' fees (including expert fees) as allowed by law; and

4. Award Plaintiff such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff hereby requests a trial by jury on all issues as allowed by law.

This the 12th day of February, 2026.

/s/ Daniel W. Koenig
N.C. State Bar No: 24357
dan@triadlawfirm.com

OF COUNSEL:

HERING KOENIG PLLC
3300 Battleground Ave, Suite 306
Greensboro, NC 27410
(p) (336)-560-7899
(f) (336) 217-8924
*Attorneys for Plaintiff*